WILLIAM A. SMITH and JAMES W. LOOPER, executors, plaintiffs in error, *v.* W. L. BYERS et al., defendants in error.

(Atlanta, January Term, 1871.)

EXECUTORS*—ACCOUNTING FOR MONEY RECEIVED—GOOD FAITH REQUIRED.—It is incumbent on the executors, in order to discharge themselves from accounting for the money received by them, by the sale of the testator's property, to show to the satisfaction of the Court and jury that the money in their hands had, in good faith, in the performance of their duty as trustees, been received and invested by them, in Confederate money, at a time when a prudent man would have done so in the management of his own affairs, and that the question whether the defendants had so acted, was a question for the jury under the charge of the Court.

EVIDENCE TO SUSTAIN VERDICT—CHARGE OF COURT.—There is sufficient evidence in the record to sustain the verdict, and there was no error in the charge of the Court, in submitting the question to the jury, nor in the refusal of the Court to charge, as requested by defendant's counsel.

(See these charges and requested charges in the report. R.)

---

See the same case in 43 Ga. 191.

*EXECUTORS—BOND—REVOCATION OF LETTERS—JURISDICTION OF COURT.—"It deserves inquiry whether, since the Code, § 331, par. 2, declares that 'courts of ordinary have authority to exercise original, exclusive and general jurisdiction of * * * the granting of letters testamentary, of administration, and the repeal or revocation of the same,' and inasmuch as the old statute (Cobb's Dig., § 307), which gave the superior court, or the judge thereof, power to require security from an executor, has not been brought forward in the Code, the court of ordinary alone has not the jurisdiction to exact bonds of executors for the faithful execution of their trust, and, to remove them from office, that is, revoke their letters. Compare Johns *v.* Johns, 23 Ga. 31; Harrup *v.* Winslet, 37 Ga. 655; Smith *v.* Byers, 41 Ga. 447-8; Dean *v.* Cotton Press Co., 54 Ga. 674; Code, §§ 2447, 2448, 2511. There seems much propriety in leaving the power of removal, and of requiring bond, with the court whose officer the executor is. This would not abridge in any way the jurisdiction or efficiency of courts of equity in dealing with assets, for as receivers can be appointed and the assets secured through their agency, these courts need not concern themselves with removing executors or seeing that they give security." Powell *v.* Hammond, 81 Ga. 579, 8 S. E. Rep. 426.

See also, citing the principal case, Wimpy *v.* Phinizy, 68 Ga. 188.

JURY—JUDGES AS TO VERDICT AND WEIGHT OF EVI-
DENCE.—The jury were the exclusive judges as to the verdict and
weight of evidence of the defendants themselves, who were examined
in their own favor.

EXTRA TIME—WHEN ASKED FOR.—If extra time be wished,
it must be asked before the argument begins. (See end of Report.)

Equity. Administrators and Executors. Confederate Money.
Before Judge Knight. Dawson Superior Court, ............
1870.

440     *In May, 1860, George Keith made his last will and
testament. By it, after providing for his burial and the
payment of his debts, he gave to his wife, absolutely, certain
named slaves which her father had given to her, and for her nat-
ural life or widowhood, his plantation and a named slave; and
gave her absolutely, stock to carry on said farm, and directed
that the balance of his property be sold by his executors "to the
best possible advantage," and that they put the money arising
from said sale out on interest and use the interest, and if neces-
sary, the principal, for the support of his family and education
of his children, and that all the property not absolutely given, be
divided equally between his children as they arrived at age. If
either child wished other than a common education, the execu-
tors were to charge the extra expense to such child. William A.
Smith, James W. Looper and testator's wife, were made his ex-
ecutors, and they were to give bond for the faithful performance
of the trust aforesaid. In June, 1860, testator died, leaving his
widow and ten children him surviving, and during that month
Smith and Looper proved the will, gave bond and were qualified
as executors cum testamento annexo.

In 1867, Mrs. Keith, being still alive and a widow, and said
children, of whom all but one were still minors, filed a bill against
Smith and Looper, which, in addition to averment of the fore-
going, stated as follows: Keith's estate consisted of lands, slaves,
etc., worth $50,000 00, all of which Smith and Looper took into
possession. They sold the perishable property in August, 1860,
and at other times, for $675 00 in cash; on the 2d of October,
1860, sold the slaves for $10,452 00 cash, and received this money,
a large part of which was in gold and the balance in lawful, par,
currency. They did not lend out said money, nor support the
family, nor educate the children: but appropriated it to their
own private uses; and they now refuse to furnish such support
and education, and will not account and settle with complainants.
The prayer was for account and settlement, for removal of the
executors and appointment of a Receiver.

Answer was waived. The nature of the defense set
441     up *will appear by the evidence, etc. Defendants de-
murred to this bill because the widow was still alive
and the children were minors and yet to be educated, and,
therefore, the time for settlement had not arrived; because
there is no averment of insolvency of defendants and because

Smith and Looper v. Byers

there was adequate remedy at law. The Court overruled the demurrer. On the trial complainants read in evidence the will and probate of it, certified copies of the intentory and appraisement of the estates, the sale bills and returns of the executors taken from the records of the Court of Ordinary. The inventory and appraisement and the sale bills are not material here. The first return averred that the whole estate had been "converted," and explained that term in figures as follows:

| | | |
|---|---:|---:|
| Sale of perishable property, 10th August, 1860, for cash... | $ 657 | 55 |
| Sale of negroes sold 2d October, 1860, for cash.......... | 10,066 | 00 |
| Sale of land in Dawson county.......................... | 396 | 00 |
| Cash received for hire of negroes...................... | 12 | 00 |
| | $11,131 | 55 |
| It contained credits amounting to...................... | 3,157 | 32 |
| Leaving balance against executors, 4th January, 1861..... | $ 8,974 | 23 |
| The second return, made in September, 1862, charged them with the interest on said balance................... | 602 | 19 |
| | $ 9,576 | 42 |
| And credited them with disbursements................. | 481 | 96 |
| Leaving balance on hands of executors................. | $ 9,094 | 46 |
| The third return, made 23d December, 1863, charged them for notes collected ............................... | 200 | 00 |
| | $ 9,294 | 46 |
| And by credits reduced their indebtedness to........... | 9,075 | 19 |

The fourth return, made in March, 1865, showed credits amounting to enough to reduce this balance to $6,781 22; but no interest is charged therein on said last balance of $9,075 19. The fifth and last return was made the 24th of May, 1866, charged them with $9,075 19 as balance of last return, added $18 00 cash collected and claimed credits reducing said balance, without interest added, to $2,321 72.

The widow testified that she got a twelve months support, of herself and eight children, slaves and property, all valued at *3,000 00, and she afterwards got $30 00 from defendants; that in 1863 she applied for money to Looper; he referred her to Smith, and he admitted that he had, say $160 00 in bank-bills, but said they were four per cent. below par and he was not willing to lose the percentage. Again she applied just before funding time of Confederate currency, and was told that they were going to fund the money, because it would bring eight per cent. interest; that defendants paid for the schooling of the children up to the filing of this bill, and that now she was supporting and schooling the four minors. Many witnesses were examined who showed that said sales were for cash and that this cash was paid generally in par bank-notes, but some of it in gold. One testified that Smith said Looper took $800 00 in gold, and another that Looper told him he

funded this gold in Confederate bonds, to get eight per cent. and to avoid being robbed.

The defendants also relied on their returns, and introduced the vouchers for the credits therein set out. They called attention to the false subtraction by which they were overcharged $1,000 00 in bringing down balance at first return, and that that error ran through the returns, as shown by the figures aforesaid. There was no contest as to most of those credits, indeed none of importance about any but $6,540 00 in Confederate bonds, mentioned in their last return, and which in making said return they swore were "in the same kind of currency as was received for said estate." To cover this, they produced Confederate seven per cent. bonds, issued March 2d, 1863, amounting to $4,500 00, and said they had $1,000 00 in others, which they had lost. (These, by consent, were considered as in evidence.) They also put in evidence the table showing the relative value of gold and Confederate currency during the war.

Smith then testified the personalty was sold for cash, as to all sums under $5 00, and on credit of three or four months for sums above $5 00; that the slaves were sold for cash. As money enough was paid in to pay Keith's debts, they considered some of the notes as money loaned out, as the money was to be put out as interest. All the money for which the *slaves were sold was paid, except in note on Stephens for $1,498 00, dated October 2d, 1861, and one on Looper, defendant, for $721 00. They paid out money for support of the family, as shown by the returns, and, while they had cash, they paid the school bills. Looper carried $400 00 of gold home, and Smith loaned one Tabor $300 00 in January, 1861. When Smith was leaving for the army, not wishing to leave the money at home, he let Looper have $1,800 00, $400 00 of which was in gold and the balance in Confederate notes. This was about six months after the loan to Tabor. This was of the money gotten for the negroes; that all money paid in after that time, except certain bank bills, $150 00 and $2 25 in United States currency, were in Confederate currency. (He produced said bank-bills as evidence.) He and Looper consulted the Ordinary, and funded the money "with good intentions," etc. He never appropriated a dollar of the money. Upon cross-examination, he said that he and Looper got in cash, at the time of the sale, all the amounts bid for slaves except said two notes. The most of the other money was received in 1862, in Confederate currency, which was then considered the best money in circulation here. Looper said he was building a mill; Smith loaned him said money and took it back in Confederate currency; also loaned Neal $1,200 00 or $1,400 00; he could not tell how many he loaned money to, nor their names. In 1862, he took from Stephens two mules and

credited his note with $450 00 and paid the Confederate money to the estate. The Stephens note was sued on and lost under the new Constitution. He funded $3,100 00 or $3,200 in May, 1863. Soon after the money was funded and turned over to Looper, Smith joined the Home Guards. He regarded himself and Looper as then solvent. Looper testified that he and Smith were brothers-in-law of testator; that he had but little to do with the management of the estate; that he received the money from Smith and could not tell what he did with it. He received from Smith $400 00 in gold and $1,400 00 in Confederate money. He received the money from Byers for the land, but did not remember how much of it was in gold. He did *not know what he did with the money; he loaned some and spent some. He loaned Joseph Smith $165 00 in gold, Jack Thompson $200 00, but did not know how the balance was used; this balance "just got into Confederate money, he mixed it with his own," etc., "just glided into Confederate money." He was building his mill then, and paid for building it in Confederate money. Smith held said note given for a slave, and he funded money to meet his note. Then Confederate money was nearly worthless. Looper refused to accept it, and in all things acted to the best of his ability. Upon cross-examination, he stated that he had not received nor loaned out any money except as stated; that he funded his own money and $600 00 for his son, and returned all he had funded. He and Smith considered the loans paid off by said return of bonds. These investments were made without any order of Court. He admitted that he had sold, on credit, to his son, a large part of his land, and that that son had divided it with Looper's other children, and that he had advised one of the securities to put his lands out of his hands; said he was still worth $3,000 00, said security was worth $3,000 00 and Smith was worth $2,500 00, but he did not know what the other security was worth. He said he used none of the estate's money to build his mill, was then amply able to build it, and said he was yet able to pay all liability to complainants.

Smith, reintroduced, said he considered certain notes in the inventory as insolvent, but had never sued on them, nor sold them as insolvent.

After argument, defendant's counsel requested the Court to charge the jury as follows: 1st, That the will was the law to the defendants, and by it they must be judged under the facts and circumstances of the case. 2d. The filing of the inventory and appraisement, sale bills and annual returns are evidences of good faith and will go far to aid the presumption of law that defendants fully complied with their duty. If complainants seek to set aside these records from fraud or illegality, they must prove fraud; it cannot be presumed.

*3. That the (executors,) defendants in this case are

Smith and Looper v. Byers

to be held to ordinary diligence in the execution of the trusts committed to them under the will of George Keith, the testator; such diligence as any prudent man would exercise in the management of his own affairs. In considering the question of diligence and the prudent management of the defendants, you may further consider, under the evidence, the time when said executors entered upon the duties involved, the fact that a civil war ensued immediately after their equalification under said will, as appears from the record, involving the existence of the government, the life, liberty and property of the citizen, and raging with unexampled fury for nearly four years—resulting in a radical change in the constitutional laws of our country, the loss of hundreds of thousands of human lives, the loss of four hundred millions of dollars worth of negro slave property, a vast amount of other property—bringing poverty and suffering in lieu of wealth and happiness. These fearful scenes were not enacted upon some distant drama, but came to our own houses and firesides. It would not be strange, under these circumstances, that defendants would have been interfered with in the preservation of the property and monied interest belonging to the estate. Much allowance is to be made in favor of the defendants under these circumstances.

4. In looking into the facts stated in said complainant's bill, and the provisions of items sixth and seventh in said will, complainants are not entitled to recover. because the contingent events specified in said item seventh have not transpired, and Mrs. Keith, the widow of testator, being still in life and not having brought any complaint against defendants, you must find in favor of defendants.

5. There are no sufficient facts charged in said bill to authorize the removal of said defendants from their trusts.

6. If said defendants have not executed the trusts under said will, then said widow, who is tenant for life and widowhood in all the estate, is the only person who can apply for and obtain the relief prayed for in said bill.

*7. If you believe, from the evidence, that said executors, for the purpose of carrying out the provisions of said will, in good faith, by selling $10,000 00 worth of negro slave property for cash, and taking interest-bearing notes, solvent at the time, and at their first succeeding return charged themselves with the entire amount as cash, this is no evidence of bad faith. But this transaction made such entry and charge against said executors in favor of said estate, a debt, the consideration of which was, and is, for the sale of slaves, and complainants cannot recover any amount of money against said defendants for such purchase-money of slaves, under the constitution and laws of said State. But, whatever part of said purchase-money may already have been paid and applied by said defendants cannot be disturbed, or if such notes or money were lost or destroyed by the results

of the war, without gross negligence by defendants, said complainants cannot recover.

8. If you believe from the evidence that the defendants invested the Confederate money, or funded it in Confederate bonds in 1863, to prevent its depreciation one-third, under the law of the Confederate Congress, then they acted under color of law and are protected.

9. In looking into all the evidence in this case, if you should feel authorized to find in favor of the defendants, this will not be a bar or prevent complainants from compelling said defendants to account to them in future for a distribution of said estate, after the death or intermarriage of the widow of the testator.

The Court refused to charge any of said requests except the first and second. When he read the third to the jury he remarked, "it is too eloquent."

The Court, upon its own motion, further charged the jury: 1st. If said executors, pursuant to any law of this State, in good faith, invested the funds of the estate in the bonds, notes or certificates of this State or of the Confederate States, they would be relieved from all penalties of mismanagement, misapplication or misappropriation of the funds of the estate by reason of such investment, provided the evidence shows *that the bonds, notes or certificates now held by them are the same which they received for said estate.

2d. If the evidence shows that defendants have in their hands such estate, and are so badly managing it as to threaten its loss or destruction, and that they are insolvent, it is competent for the jury to find and decree that a Receiver be appointed to take charge of said estate.

3d. That if the executors sold slaves on credit and are now suing on the notes given for them, the purchasers can plead the fact that the consideration was slaves in bar of recovery; but if they received money for slaves sold by them as such executors, they, the executors, cannot set up said defence to keep from accounting for said money.

The jury found for the plaintiffs against the defendants for $5,500 00 and costs, and that they should be removed from the executorship and turn over the estate to a Receiver, and a decree was taken according to the verdict.

Said defendants moved for a new trial upon the grounds, that the court erred in not dismissing the bill upon the said demurrer; because the decree is contrary to the law, the evidence and equity, and contrary to the first charge given by the Court on its own motion; because the second of said requests given upon the Court's own motion was wrong, because no insolvency or threatened loss or destruction of the estate was charged in the bill; because the Court refused to charge the requests of defendant's counsel,

Hill v. Wilker

except the first and second; because the Court said in the hearing of the jury, that said third request was too eloquent, and because in charging the jury the Court expressed an opinion as to what had been proved.

This last ground the Court certified is not true. He refused a new trial and error is assigned on each of said grounds.

In the argument here the Court would not hear from counsel for defendant in error on the demurrer. They asked for damages for delay by frivolous writ of error, but said if the Court found the verdict too large, they ought to say how much too large and have that sum remitted and end the litigation.

*Pending the argument extra time was asked. The Court refused it upon the ground, that the statute requires it asked for before argument begun.

W. L. Smith, J. N. Dorsey, Weir Boyd, for plaintiffs in error.

H. P. Bell, Geo. D. Rice, S. H. Johnson, for defendant, said Chancery has jurisdiction over executors as trustees: Revised Code, section 3087; 23d Georgia Reports, 31; 16th, 213; 14th, 325. Returns are prima facie evidence for executors: 23d Georgia Reports, 326. They should take security: Revised Code, section 2515. And are responsible if loss, by their negligence: Revised Code, section 2496; 8th Georgia Reports, 388. Both are liable: 1st Kelly, (Georgia Reports) 37; 4th, 557; 8th, 388; 11th Vessey, 333; 4th Vessey, 596; 7th Johnson's Chancery Reports, 22.

WARNER, J.

On looking through the record in this case and considering the errors assigned therein, we are of the opinion that the motion for a new trial was properly overruled by the Court below. There is sufficient evidence to sustain the verdict, and the jury were the exclusive judges as to the credibility and weight of the defendant's evidence, who were examined in their own favor on the trial.

Let the judgment of the Court below be affirmed.

---

*JOHN W. HILL, plaintiff in error, v. JOHN W. WILKER, defendant in error.

(Atlanta, January Term, 1871.)

CONFLICT OF LAWS—PRESUMPTION THAT LEX LOCI CONTRACTUS SAME AS GEORGIA LAW.—Where a note was made and delivered in the purchase of a mining privilege at Pike's Peak, in Kansas, on the Sabbath day, and suit thereon is brought in the Courts of this State, and there is no evidence of the lex loci contractus produced on the trial.

*Held*, That the presumption of law is, that the law of the place where the note was made is the same as our own; especially will such presumption be made where a contrary presumption would be unjust to the christian civilization of the age and in violation of the decalogue.